**DEGUSSA CORPORATION, PIGMENT DIVISION, North America Silica Company and P.Q. Corporation, Appellants–Defendants,**

v.

**Lenita MULLENS, Appellee–Plaintiff.**

**AGRITEK BIO INGREDIENTS, INC., Appellant–Defendant,**

v.

**Lenita MULLENS, Appellee–Plaintiff.**

No. 49A05–9706–CV–215.

Court of Appeals of Indiana.

June 5, 1998.

Richard R. McDowell, Hill Fulwider McDowell Funk & Matthews, Indianapolis, for American Laboratories, Inc.

Dale W. Eikenberry, Wooden McLaughlin & Sterner, Indianapolis, for Agritek Bio Ingredients, Inc.

Cory Bundage, Ice Miller Donadio & Ryan, Indianapolis, for Degussa Corporation, Pigment Division, North American Silica Company and P.Q. Corporation.

James M. Hinshaw, David O. Tittle, Bingham Summers Welsh & Spilman, Indianapolis, for Henwood Feed Additives.

Norman T. Funk, Hill Fulwider McDowell Funk & Matthews, Indianapolis, for Carl S. Akey, Inc.

Richard J. Dick, William W. Hurst, Mitchell Hurst Jacobs & Dick, Indianapolis, for Appellee–Plaintiff.

## OPINION

SHARPNACK, Chief Judge.

This case comes to us on interlocutory appeal from the denial of the defendants-appellants' motion for summary judgment. The dispositive issue for our review is whether the motion should have been granted because the plaintiff-appellee's claims are barred by the statute of limitations. We reverse and remand with instructions.

The relevant facts follow. Lenita Mullens began to work at an animal feed company in September of 1990. She was hired to mix various powdered and liquid ingredients into livestock feeds. On March 25, 1994, Mullens filed a complaint against Degussa Corporation, Pigment Division, North America Silica Company, P.Q. Corporation, and Agritek Bio Ingredients, Inc. (collectively the "appellants").[1] In her complaint, Mullens alleged

---

1. We note that Mullens also included several other defendants in the original complaint. However, they were either not included in the amended complaint or they are not otherwise parties to this appeal. In addition, Agritek Bio Ingredients, Inc. appealed separately from the trial court's denial of its motion for summary judgment and raised additional issues relating to the denial of its motion to dismiss for lack of subject matter jurisdiction. Agritek's appeal was

that she suffered permanent lung damage due to employment-related exposure to various chemicals, some of which were manufactured, sold, or supplied by the various appellants. The appellants joined in a motion for summary judgment on the basis that Mullens' claims were not asserted within the two year statute of limitations. On May 1, 1997, the trial court denied the appellants' motion for summary judgment.

■■■ The dispositive issue for our review is whether the motion for summary judgment should have been granted because Mullens' claims are time barred. When reviewing the denial of summary judgment, we use the same standard used by the trial court. *Ramon v. Glenroy Construction Co.*, 609 N.E.2d 1123, 1127 (Ind.Ct.App.1993), *trans. denied.* Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). The movant bears the burden of establishing the propriety of summary judgment, and all facts and inferences to be drawn therefrom are viewed in a light most favorable to the non-movant. *Ramon*, 609 N.E.2d at 1127. The defense of a statute of limitations is particularly suitable as a basis for summary judgment. *Gilp v. Neville*, 681 N.E.2d 1173, 1175 (Ind.Ct.App.1997), *trans. denied.*

■■■ Mullens' action, which is based upon theories of negligence and products liability, is governed by Ind.Code § 33–1–1.5–5, which states that "any product liability action in which the theory of liability is negligence or strict liability in tort" must be commenced within two years after the cause of action accrues. The question of when an action "accrues" has not been addressed by the legislature. However, our supreme court has adopted a discovery rule for accrual of claims arising out of illnesses allegedly caused by prolonged toxic exposure. *See Barnes v. A.H. Robins Co.*, 476 N.E.2d 84, 87 (Ind. 1985). Under this discovery rule, the statute of limitations:

"commences to run from the date the plaintiff *knew or should have discovered that she suffered an injury* or impingement, and that it was caused by the product or act of another. It is contemplated that persons armed with these indices have a fair opportunity to investigate available sources of relevant information and to decide whether to bring their claims in court within the time limitations in the statute." *Id.* at 87–88 (emphasis added).

The discovery rule as described in *Barnes* has been further considered in both federal and state courts. In *Miller v. A.H. Robins Co.*, the seventh circuit applied the *Barnes* discovery rule and addressed the question of what degree of knowledge is required to reach the "should have discovered" threshold for a connection between the illness and the product. *Miller v. A.H. Robins Co.*, 766 F.2d 1102 (7th Cir.1985). In *Miller*, the plaintiff "knew she had suffered an injury when she was hospitalized in 1974" that resulted from using a Dalkon Shield. *Id.* at 1103. The plaintiff contended, however, that she neither knew nor should have discovered the cause of her illness until seven years later when definitive testing was done. The plaintiff argued that the limitations period begins to run only when a plaintiff knows or should have discovered that the defendants' product was "the actual cause, rather than a possible or probable cause, of the injury." *Id.* at 1105.

The court of appeals rejected this argument, saying that it was "inconsistent with Indiana law." *Id.* The court stated:

"The notion of 'a fair opportunity to investigate' suggests that discovering 'the cause' is something less than possessing irrefutable proof of causation. The doctors' statement, by itself, informed Ms. Miller of a possible causal connection, and should have prompted Ms. Miller either to contact a lawyer or to conduct her own inquiry." *Id.*

In 1990, the seventh circuit again considered Indiana's discovery rule. *See Evenson v. Osmose Wood Preserving Co.*, 899 F.2d

---

consolidated with the other appellants' appeal by this court. Given our conclusion that Mullens' claims are time barred, we need not address the

additional issues raised by Agritek and the other appellants.

701 (7th Cir.1990), *reh'g denied.* In *Evenson*, the issue was whether the statute of limitations had run against the plaintiff who failed to file suit within two years of forming his own uncorroborated suspicions of a causal connection between his illness and his exposure to a chemical at work. The court noted that the "unusual factor" in the case was that no doctor had confirmed the plaintiff's suspicions prior to the two-year period before he filed his complaint. *Id.* at 704.

Ultimately, the court held that the statute did not run against the plaintiff because he had "only a layman's mere suspicion" as to causation. *Id.* at 705. The court distinguished its previous decision in *Miller* because in that case, the plaintiff had been told by her doctor of the possible causal connection while the plaintiff in *Evenson* "received no indication anytime prior to the two-year period before he filed his complaint that his suspicion as to the cause of his injuries might be correct." *Id.* at 704. The court stated:

> "Defendants claim that knowledge of a possible cause of one's injuries is the standard under *Miller* and that Evenson's belief as to the cause of his injuries meets this standard. It is true we referred to plaintiff's knowledge of a 'possible cause' in *Miller.* Defendants, however, attempt to elevate these references to the level of a standard, a result of which we did not intend. Under the facts of *Miller,* it was clearly more than a mere possibility that the Dalkon Shield was the cause of Ms. Miller's pelvic infection."

*Id.* at 705 n. 6 (citation omitted). The court further held the "mere suspicion or speculation" of a "layperson without technical or medical knowledge" is not enough to constitute a reasonable possibility. *Id.* at 705. The plaintiff had argued that a doctor's testimony, based on medical probability that the product caused the injury, should be the threshold requirement. The court of appeals rejected this proposed standard, noting that the cases applying the Indiana discovery rule do not make such diagnosis necessary. *Id.* at 704–705. Instead, the court said, "where knowledge of causation is at issue, a person knows or should have discovered the cause of his injury when he has or should have discov-

ered *some* evidence that there was a reasonable possibility that his injury was caused by the act or product of another." *Id.* at 705 (emphasis added).

The court then considered what constitutes some evidence of a reasonable possibility. It concluded that "events short of a doctor's diagnosis can provide a Plaintiff with evidence of a reasonable possibility ..." and referred to *Miller* as a case where there was "clearly more than a mere possibility...." *Id.* at 705 n. 6. What raised *Miller* above the level of a mere layman's suspicion or speculation was that Miller had been told by her doctor that the Dalkon Shield was a possible cause. The court of appeals noted its approval of the district court's interpretation of Indiana's discovery rule as follows:

> "The district court observed that the Indiana discovery rule emphasizes knowledge of a *potential rather than an actual link.* Citing *Miller v. A.H. Robins Co.,* 766 F.2d 1102 (7th Cir.1985), the district court stated that the causation prong of the discovery rule 'is satisfied if the plaintiff is informed of a "possible causal connection" between the foreign substance and the injury of which he complains.' Again relying on *Miller,* the district court noted that having a fair opportunity to investigate available sources of information *does not require possessing irrefutable proof of causation.*"

*Id.* at 703 (emphasis added).

The Indiana Supreme Court revisited the discovery rule again in *Allied Resin Corp. v. Waltz,* 574 N.E.2d 913 (Ind.1991). In *Allied,* the supreme court reversed summary judgment in favor of a plaintiff on the issue of whether the statute of limitations had run. The trial court had previously determined that the statute had not run because the plaintiff contended he was not given an affirmative diagnosis by a doctor that his symptoms were related to his exposure to certain chemicals until less than two years before he filed suit. The supreme court noted, however, that although the lack of an "affirmative diagnosis" may mean the plaintiff did not "know" of a casual connection, it did not resolve the issue of whether she "should have discovered" the connection. *Id.* at 915. The

court specifically noted the testimony of an earlier doctor who testified that he informed the plaintiff "that his symptoms were 'possibly caused' by exposure to chemicals" more than three years before the suit was filed. *Id.* at 914. The court reasoned that this was the relevant evidence of when the plaintiff should have discovered the connection. *Id.* at 915. However, because the plaintiff denied that the doctor had made the comment, the supreme court found that there was a genuine issue of material fact as to whether the plaintiff should have discovered the causal connection. *Id.*

■ These cases confirm that the Indiana discovery rule provides a two-year period during which a potential plaintiff has a fair opportunity to investigate. The discovery rule does not toll the statute of limitations until all uncertainty is eliminated. *Miller*, 766 F.2d at 1105. Rather, once a plaintiff confirms or is informed that a product is a possible cause of her illness, the fair opportunity to investigate for up to two years commences. *See id.* at 1106. Mullens claims that "[t]here is no evidence that any doctor had made a determination of the likely or probable cause of Mullens medical condition and had told Mullens at any time prior to March 25, 1992 that she had been injured and that it was *likely or probable* that her injured [sic] had been caused by a product she was exposed to in her work environment." Appellee's brief, p. 14 (emphasis original). However, we find nothing in the above referenced authority to require her to know the likely or probable cause before the statute of limitations started to run. In the words of the *Evenson* court, a connection consisting of a "potential rather than an actual link" to the chemicals is all that is necessary to start the statute of limitations, not a definitive diagnosis "based on medical probability." *Evenson*, 899 F.2d at 703–704. Therefore, contrary to Mullens' contention, the dispositive issue before us is whether there is a genuine issue of material fact with respect to when Mullens had a fair opportunity to investigate the cause of the injury, rather than when she knew the likely or probable cause of the injury.

The designated evidence establishes that after three or four months on the job, Mullens began wearing paper masks to make the job more comfortable because with a mask "you didn't inhale the dust." Record, pp. 432–433. Mullens developed a cough that would get better after she went home and it would go away on weekends. Eventually, she began using respirators because the paper masks got too clogged up and "you couldn't get any air through them." Record, p. 439.

In March of 1991, Mullens went to the emergency room. However, Mullens' cough and shortness of breath continued and gradually worsened. On February 4, 1992, Mullens again went to the emergency room because she was having trouble breathing. Mullens described that evening as follows:

"I had worked ... and had been coughing off and on all day that day and shortness of breath going up the steps. But by the time the end of the day got there, I was—it had really gotten severe, severe enough where I went to the front office to get away from the dust and sit down, and it didn't go away. I could not breathe. I just couldn't get any oxygen. I was just gasping. And so it was that evening after I went home and I still—I wasn't any better after I even got out of the plant, that I went to the emergency room."

Record, pp. 458–459. The emergency room records indicate that Mullens told the doctor she worked with chemicals.

Mullens' cough continued after her emergency room visit, and her shortness of breath continued to worsen. On March 17, 1992, Mullens visited her family doctor, Dr. Kenneth Watkins. Mullens took a portion of the label on a bag of one of the chemicals with her to show the doctor. Mullens specifically told Dr. Watkins that she was exposed to chemicals at work and showed him the product ingredient label. She stated that she did so because "that was just one of the things that would bother me, I noticed would cause my coughing." Record, p. 655. Dr. Watkins stated in his deposition that Mullens told him that she felt her "exposure to dust which she has at work ha[d] been contributing to her illness." Record, pp. 992–993.

In addition, Dr. Watkins stated that on that date he concluded Mullens was sick and

that although the ultimate diagnosis was unclear at that time, he suspected the products with which she worked may have caused or contributed to her illness. Dr. Watkins also stated that he informed Mullens of his conclusions during her appointment on March 17. Specifically, he told her that "there was a possibility that [her condition] could be work related." Record, pp. 655–656. Dr. Watkins also told her that she needed to further investigate the connection between her illness and her work exposure. Dr. Watkins gave Mullens some breathing tests and instructed her to follow up with a chest x-ray because her "pulmonary problems could possibly be due to work place exposures." Record, p. 656. Mullens indicated that "it was after that date that I started searching for something to see if there was a possibility of that." Record, p. 422.

Mullens acknowledged several times during her deposition that Dr. Watkins told her on March 17, 1992, that her condition could be work related. Further, Mullens indicated more than once in her answers to interrogatories that Dr. Watkins had told that her condition might be associated with her employment.

Furthermore, on March 18, 1992, Mullens filled out and signed a form for worker's compensation. Mullens stated in her deposition that she completed the form because she "suspected that [her] pulmonary problems were caused by workplace exposures." Record, pp. 656–657. On the worker's compensation form, she entered "Coughing, Chest Pain, short of breath" as the nature of her injury. Record, p. 871. She stated that her "chest/lungs" were the part of the body affected. Record, p. 871. In addition, when asked to describe how the exposure occurred, Mullens answered "Breathing dust and fumes." Record, p. 871. When asked about this claim at her deposition, Mullens admitted that at least by March 18, 1992, she had

begun to suspect her workplace exposures caused her pulmonary problems.

Following testing in his office on March 23, 1992, Dr. Watkins concluded that Mullens suffered from "severe restrictive disease" and displayed symptoms of obstructive disease as well. Record, p. 1004. He referred her to a pulmonary specialist to investigate the connection between her condition and her exposure to the chemicals. Dr. Watkins made an entry in Mullens' records that she was "'unable to expose self to fumes and/or irritants inhaled until further notice,' minimum of two weeks." Record, p. 1005. Dr. Watkins also wrote a note for Mullens' employer indicating that she should not be exposed for at least two weeks. Dr. Watkins stated that the fact that Mullens told him that her condition seemed to improve when she was away from the dust signaled to him that the products and her disease "sure may be related." Record, p. 1008.

Moreover, in her response to the summary judgment motions filed by the various appellants, Mullens admitted that "[t]here is no factual dispute that Lenita Mullens was first told by a doctor that her condition could be product induced more than two years before she filed suit." Record, p. 1366. Nonetheless, Mullens did not file her suit until March 25, 1994, more than two years from her two appointments with Dr. Watkins and her completion of the worker's compensation claim form.

We conclude that this evidence establishes that Mullens had a medical condition sufficient to be considered an injury as early as 1991 and certainly by February and March of 1992 when she sought treatment from the emergency room and her family doctor for chest pains, coughing, and difficulty breathing.[2] In addition, the evidence relating to her visits with Dr. Watkins and her worker's compensation claim clearly establishes that she suspected her work environment was a possible cause of her illness. Her suspicions,

2. We note that Mullens argues that "[k]nowing that one has a medical condition that may somehow be affected by exposure to something in the work environment is not the same as knowing that one has suffered an injury caused by a product." Appellee's brief, p. 9. Further, she asserts that "[t]here was no indication from any of the information available to her at that time

that she had anything of a permanent nature that would suggest to a reasonable person that an injury had been suffered." Appellee's brief, p. 11. She claims that "[a]ll she knew was that the doctor believed that exposure to something in her workplace possibly was affecting her medical problems and that she might have bronchitis." Appellee's brief, p. 11. However, there is noth-

which motivated her to cut off a portion of a chemical's label and take it to her doctor, were confirmed by her doctor's statements that the chemical was a possible cause of her illness. As such, because Mullens was told that the chemicals were a possible cause of her illness, the fair opportunity to investigate for up to two years commenced at least at that point. *See Miller*, 766 F.2d at 1106–1107. Mullens "should have discovered" she had suffered an injury caused by the appellants more than two years before she commenced her suit.

Mullens sought to create a genuine issue of material fact as to her subjective state of knowledge by filing an affidavit in opposition to the appellants' motion for summary judgment. In the affidavit, Mullens attempted to establish that she was confused and that she did not know with certainty the source of her problems until March of 1994.[3] However, a lack of confusion on a potential plaintiff's part is not the test of when the statute of limitations begins to run. As our supreme court explained in *Barnes*, the statute provides potential plaintiffs a two-year long "fair opportunity to investigate available sources of relevant information and to decide whether to bring their claims...." *Barnes*, 476 N.E.2d at 87. Thus, the statute begins to run when suspicion arises, not when all confusion or doubt is dissipated. To the contrary, the two-year period of investigation promotes the evaluation of confusing or conflicting information. As the United States Supreme Court has stated:

> "A plaintiff ... armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims...."

*United States v. Kubrick*, 444 U.S. 111, 122–123, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979). Moreover, under the discovery rule, what the plaintiff knew or should have discovered is tested by the objective standard of what a "reasonable person" should have known. *See Miller*, 766 F.2d at 1106. Regardless of Mullens' intended effect of the affidavit with respect to her certainty of the source of her problems, the uncontradicted evidence that she took the label to her doctor on March 17, 1992, who told her that her condition "sure may be related" to her exposure at work, is sufficient to establish that Mullens had a fair opportunity to investigate her injury and its cause at that time.

Therefore, the appellants are entitled to summary judgment as a matter of law because Mullens failed to file her claims within the statute of limitations. Accordingly, we reverse the judgment of the trial court and remand for the trial court to enter judgment in favor of the appellants who joined in that motion.

Reversed.

RUCKER and HOFFMAN, JJ., concur

---

ing that requires a plaintiff's condition be permanent or untreatable to be considered an "injury" for purposes of the statute of limitations. By her own admission, Mullens knew she was sick and sought extensive treatment for a medical condition that she had been told could possibly be caused by her work environment. This medical condition, which included serious chest pains, coughing, and difficulty breathing, qualifies as an injury for purposes of determining the statute of limitations period.

3. Mullens also claims in her brief that "[i]t was not unreasonable for [her] to not have concluded by March 26, 1992 that she had suffered an injury caused by a product, when the specialist was unsure of the cause of her condition and the nature of the condition. Mullens cannot be held

to know more than the specialist knew." Appellee's brief, pp. 11–12. In addition, Mullens claims that "[i]t is contrary to the philosophy of the discovery rule to hold that as a matter of law under the facts of this case that a reasonable person absolutely would have concluded on March 17, 1992 that they had suffered an injury from exposure to chemicals and that their suspicions were not quashed by the statements of the Degussa employees." Appellee's brief, p. 16. However, Mullens was not required to have concluded by March 17, 1992, that she had suffered an injury caused by a product. Rather, Mullens had two years from that doctor's visit to further investigate the cause and commence an action. That period of investigation is one of the purposes of having statutes of limitations.