L. Thomas BOOTH and Norma Sue Booth, Appellants–Plaintiffs,

v.

Robert G. WILEY, M.D., Ronald K. Norlund, O.D., and Midwest Eye Consultants, P.C., d/b/a Cataract & Laser Institute and Clearvision Laser Centers, Great Lakes, LLC, Appellees–Defendants.

No. 02A03–0210–CV–355.

Court of Appeals of Indiana.

Aug. 20, 2003.

James P. Fenton, Leonard E. Eilbacher, Alan L. VerPlanck, Eilbacher Scott, P.C., Fort Wayne, IN, Attorneys for Appellants.

Dane L. Tubergen, Hunt Suedhoff Kalamaros, LLP, Fort Wayne, IN, Attorney for Robert G. Wiley, M.D.

John Johnston, Johnston & Johnston, Wabash, IN, Attorney for Dr. Ronald K. Norlund and Midwest Eye Consultants, P.C.

## OPINION

MAY, Judge

L. Thomas Booth ("Booth") and his wife, Norma Sue Booth, appeal the trial court's grant of summary judgment for defendants Robert G. Wiley, M.D. ("Dr.Wiley"), Ronald K. Norlund, O.D., ("Dr.Norlund") and Midwest Eye Consultants, P.C., d/b/a Cataract & Laser Institute ("Midwest Eye") (collectively, "the doctors"). The Booths raise two issues, which we restate as whether the trial court properly found the Booths filed their medical malpractice complaint outside the statute of limitations.

We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

This complicated fact scenario began on October 26, 1998, when sixty-year old Booth was evaluated by Dr. Norlund, an optometrist with Midwest Eye, for the possibility of surgical correction of Booth's vision by the means of Lasik surgery.[1] Dr. Norlund informed Booth that he was a "twelve," designating extremely poor vision. Booth disclosed to Dr. Norlund his history of glaucoma and cataracts, and Dr. Norlund advised him that those pre-existing conditions would not be a deterrent to surgery.

Based on Dr. Norlund's recommendations, Dr. Wiley performed bi-lateral Lasik surgery on Booth on November 2, 1998.

Booth noticed an improvement in his vision but the improvement was less than he had hoped. As a result, Dr. Wiley performed laser enhancement surgery on both of Booth's eyes on February 8, 1999. Booth's vision improved somewhat after this enhancement.

On May 4, 1999, Dr. Wiley performed cataract surgery on Booth's right eye. The cataract was successfully removed, although there was a great deal of hemorrhaging. Because of that, Dr. Wiley did not implant an intraocular lens during the surgery. On May 11, 1999, Dr. Wiley implanted the intraocular lens in Booth's right eye. Booth's vision in his right eye was very poor at that time. Dr. Wiley performed an additional surgery on August 2, 1999 to replace the intraocular lens.

Booth questioned Dr. Wiley about his poor vision. He was told he might have suffered a series of mini strokes, and the vision in his right eye was failing because of plaque deposited following the strokes. Because of Booth's complaints, Dr. Wiley referred him to Dr. Sandra Chern, a retinal vitreous specialist. Dr. Chern examined Booth on October 5, 1999. Her examinations revealed "swelling in the right eye, a posterior vitreous detachment, retinal hemorrhages in the mid-periphery and damage to the optic nerve as a result of the interruption of the blood supply to the nerve, which damage and loss of vision is permanent." (App. to the Br. of Dr. Ronald K. Norlund & Midwest Eye Consultants, P.C., at 9.)

By December 2000, the sight in Booth's left eye was also failing because of cataracts, and he asked Dr. Wiley to refer him to another physician. On December 4, 2000, Booth met with Dr. Rex Parent, an ophthalmologist. During that initial consultation, Dr. Parent informed Booth that

1. Lasik surgery is a surgery performed with a laser to enhance vision.

because of his pre-existing cataracts and glaucoma, Lasik surgery should not have been performed. Dr. Parent performed cataract surgery on Booth's left eye on February 13, 2001.

The Booths first met with legal counsel on April 9, 2001, and their complaint for medical malpractice was filed on July 24, 2001. That complaint also included claims under the doctrine of fraudulent concealment and the Indiana Deceptive Consumer Sales Act. The Booths filed a complaint with the Department of Insurance on September 18, 2001.

The doctors moved for summary judgment and the trial court entered an order granting those motions. The trial court found

the occurrence-based limitation period is constitutional as applied to Booth, who in this case, should have reasonably been expected to learn of his injury in October 1999 [when Booth saw Dr. Chern]. The statute of limitations did not shorten the window of time between the discovery of the alleged malpractice and the expiration of the limitation period so unreasonably that it became impractical for Booth to file his claim.[2]

(Br. of the Appellants at 26.) With respect to the Booths' other claims, the trial court found that "[a]s a result of this discussion, Plaintiffs' claims under the Doctrine of Fraudulent Concealment and the Indiana Deceptive Consumer Sales Act are also time barred." (*Id.*)

## DISCUSSION AND DECISION

The issue in this case centers around the date Booth knew or reasonably should have known that the Lasik surgery should not have been performed and was the cause of his continued vision complaints.

The doctors essentially contend that by October of 1999 at the latest, when Booth was seen by Dr. Chern, he knew or should have known his condition was related to the Lasik surgery. Consequently, according to the doctors, the Booths should have filed their complaints by October of 2001.

Dr. Wiley also contends that if Booth's loss of vision was caused by the lens implant surgery on May 11, 1999, the statute of limitations would have expired on May 11, 2001. Dr. Norlund and Midwest Eye argue that because the last Lasik surgery was performed on February 8, 1999, Booth's statute of limitations expired on February 8, 2001.

Booth argues he was unaware of the connection between the Lasik surgery and his loss of vision until December 4, 2000, when Dr. Parent informed him that because of Booth's cataracts and glaucoma, Lasik surgery should not have been performed; therefore, according to the Booths, the filing of the complaint on July 24, 2001 was within the statute of limitations.

 Our occurrence-based malpractice statute of limitations has been upheld as constitutional on its face under Article 1, Sections 12 and 23 of the Indiana Constitution. *Martin v. Richey*, 711 N.E.2d 1273, 1279 (Ind.1999). However, under some circumstances the statute of limitations is unconstitutional as applied to plaintiffs who, in the exercise of reasonable diligence, could not have discovered the alleged malpractice within the two-year limitation period. *See Van Dusen v. Stotts*, 712 N.E.2d 491, 495 (Ind.1999); *Martin*, 711 N.E.2d at 1285. Where the statute of limitations is unconstitutional as applied, plaintiffs have a full two years

---

**2.** Although we disagree with the trial court's ultimate ruling, we commend the court for the quality of its Order.

from the date "they discover the malpractice and resulting injury or facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury." *Van Dusen,* 712 N.E.2d at 493.

In *Boggs v. Tri–State Radiology, Inc.,* 730 N.E.2d 692, 695 (Ind.2000), *reh'g denied,* our supreme court addressed whether the occurrence-based limitation period was unconstitutional as applied to plaintiffs who cannot reasonably be expected to learn of their injury when the alleged malpractice occurs, but nevertheless discover the injury before the expiration of the statute of limitation. The *Boggs* court held that "as long as the statute of limitations does not shorten this window of time [between the discovery of the alleged malpractice and the expiration of the limitation period] so unreasonably that it is impractical for a plaintiff to file a claim at all, as it did in *Martin* and *Van Dusen,* it is constitutional as applied to that plaintiff." 730 N.E.2d at 697.

In *Rogers v. Mendel,* 758 N.E.2d 946, 951 (Ind.Ct.App.2001) *reh'g denied, trans. denied* 774 N.E.2d 515 (Ind.2002), this court articulated a two-step analysis for the application of Indiana's two-year malpractice statute of limitations. The first step is to determine whether the plaintiff discovered the alleged malpractice and resulting injury, or possessed information that through the exercise of reasonable diligence would have led to such discovery, within the limitation period. *Rogers,* 758 N.E.2d at 951. If the answer is affirmative, then the limitation period is constitutional as applied, so long as the claim can reasonably be asserted in the time that remains. *Id.; and see Boggs,* 730 N.E.2d at 697. If the discovery is after the limitation period has expired, then the limitation period is unconstitutional as applied. *Rogers,* 758 N.E.2d at 951–52; *and see Van*

*Dusen,* 712 N.E.2d at 493; *Martin,* 711 N.E.2d at 1285.

When discovery occurs after the limitation period has expired, a second stage of analysis must be applied to determine when the plaintiff had information that in the exercise of reasonable diligence would have led to the discovery of the alleged malpractice. *Rogers,* 758 N.E.2d at 952. This second stage leads to a determination of the date on which a full two-year period of limitation begins to run.

Dr. Norlund recommended on October 26, 1998 that Booth undergo Lasik surgery. The last Lasik surgery took place on February 8, 1999. By October 5, 1999, when Booth saw Dr. Chern, he knew the loss of vision in his right eye was permanent. However, Booth was not aware until December 4, 2000, when he saw Dr. Parent, that Lasik surgery should not have been performed.

■ We must therefore determine whether Booth's "discovery" of a cause of action occurred on October 5, 1999, when he learned his vision loss was permanent, or on December 4, 2000, when Dr. Parent informed him that Lasik surgery should not have been performed. In formulating the rule determining what constitutes the date of discovery, the *Van Dusen* Court considered Indiana decisions that construed the general tort liability and product liability statutes of limitation. One of those decisions held that the statute of limitations for a negligence and products liability action began to run when the plaintiff was informed by her doctor of a possible causal link between her illness and exposure to various chemicals and the need to investigate further. *Van Dusen,* 712 N.E.2d at 499 (citing *Degussa Corp. v. Mullens,* 695 N.E.2d 172, 178 (Ind.Ct.App. 1998), *trans. granted, opinion vacated,* 706 N.E.2d 178 (Ind.1998)). In another case considered by the *Van Dusen* court, it was

emphasized that "while events short of a doctor's firm diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's act ... caused his injuries ..., there must be something more than the mere suspicion or speculation by a plaintiff who is without technical or medical knowledge." *Id.* at 498 (citing *Evenson v. Osmose Wood Preserving Co. of America,* 899 F.2d 701, 703 (7th Cir.1990)). This is not to say, however, that a plaintiff needs to "know with certainty" that malpractice has occurred. *Id.* at 499.

This case is similar to *Jacobs v. Manhart,* 770 N.E.2d 344 (Ind.Ct.App.2002), *reh'g denied, trans. denied* 783 N.E.2d 701 (Ind.2002). Ms. Manhart had a long history of abnormal pap smears followed by a series of pap smears reported as normal. The last pap smear reported as abnormal was in June of 1996. On August 24, 1999, she was diagnosed with a large tumor, and a doctor in a subsequent opinion advised her that it was very advanced. She underwent a radical hysterectomy, recovered from that surgery, and had a suspicion by October of 1999 that some of her pap smears had been mis-read. This was confirmed to her in April of 2000, and her complaint was filed on May 16, 2000. We found she acted with reasonable dispatch in filing her claim within nine months from the time she learned she had cancer. *Id.* at 355.

Based on the record before us, we cannot say Dr. Chern's diagnosis of a permanent vision loss gave Booth a basis to reasonably suspect, based on "more than the mere suspicion or speculation by a plaintiff who is without technical or medical knowledge," *id.* at 354, malpractice attributable to the Lasik surgery. During his time of treatment with Dr. Wiley, Booth had been told one of his underlying conditions, i.e., glaucoma, cataracts, or mini-strokes, had caused his vision loss.

The record does not reflect Booth was informed before December 4, 2000, that Lasik surgery was not recommended for patients with glaucoma and cataracts. As a result, we find the date of discovery was not October of 1999, but instead was December 4, 2000.

■ If the date of the malpractice was that of the last Lasik surgery, February 8, 1999, and Booth discovered the cause of the malpractice on December 4, 2000, then he had approximately two months to file a claim before the statute of limitations expired. The *Boggs* court held the plaintiff must have a "meaningful opportunity" to pursue her malpractice claim. 730 N.E.2d at 696. Where the plaintiff first becomes aware of a malpractice claim shortly before the expiration of the limitation period, the issue becomes whether the plaintiff is faced with "the practical impossibility" of asserting the claim before the limitation period expires. *Id.* at 697.

We hold that where only two months remained in the limitation period, it was a "practical impossibility" for the Booths to assert a timely claim. To do so Booth would have had to undergo additional cataract surgery, recover, and locate an attorney willing to represent him. That attorney would need a reasonable amount of time to investigate the Booths' claims.

Booth's last cataract surgery was February 13, 2001, and he met with his attorneys on April 9, 2001 for the purpose of pursuing a medical malpractice claim. One of his attorneys met with Dr. Parent on May 14, 2001, and was informed Booth should not have undergone Lasik surgery. The complaint was filed on July 24, 2001 seven months after Booth discovered the link between his loss of vision and the Lasik surgery. The Booths filed their complaint

with the Indiana Department of Insurance on September 18, 2001.[3]

Dr. Wiley contends the insertion of the intra-ocular lens on May 11, 1999, was also asserted by the Booths as an act of malpractice. He argues the Booths therefore had until May 11, 2001 to file their complaint.[4] We have determined that Booth became aware of the potential malpractice on December 4, 2000 five months before the expiration of the statute of limitations under Dr. Wiley's argument. We find that, under the facts of this case, a five-month delay is not unreasonable.

The Booths filed their complaint for medical malpractice within the appropriate statute of limitations. We accordingly reverse and remand.[5]

KIRSCH, J., and RILEY, J., concur.

3. Affidavits from the Booths' attorneys reflect they were initially informed by the Department of Insurance that Dr. Norlund and Midwest Eye were not qualified under the Indiana Medical Malpractice Act. They learned after July 24, 2001 that Dr. Norlund and Midwest Eye were qualified, and so they filed the complaint with the Department of Insurance.

4. Dr. Wiley did not address, either in his Memoranda in support of summary judgment or his brief to this Court, his further surgery on Booth to replace the intra-ocular lens, which took place on August 2, 1999. If we were to use that date as the date of malpractice, Booth's statute of limitations would have expired on August 2, 2001 after the filing of the initial complaint.

5. The trial judge based her grant of summary judgment on her analysis of the statute of limitations issue, and thus found that the Booths' claim under the Deceptive Consumer Sales Act was also time barred. The Order includes no separate ruling on the validity of the claim under the Deceptive Consumer Sales Act, although the Memoranda in support of Dr. Norlund, Dr. Wiley and Midwest Eye address the effect of that Act as separate from their statute of limitations defense. As none of the appellate briefs address the validity of the Booths' claim under the Deceptive Consumer Sales Act, we do not address that claim and we express no opinion as to the validity of any such claim.